# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 19-cv-23965-JEM

JOSÉ RAMÓN LÓPEZ REGUEIRO,

    plaintiff,

v.

AMERICAN AIRLINES INC. and
LATAM AIRLINES GROUP, S.A.,

    defendants.

_____/

**SECOND AMENDED COMPLAINT FOR DAMAGES**

José Martí International Airport (the "Airport") is Cuba's main domestic and international airport, serving millions of travelers every year, into, out of, and around Cuba. It serves dozens of airlines that use the airport to transport cargo as well as passengers, and operates as the hub for Cuba's two main airlines: Cubana de Aviación ("Cubana") and Aerogaviota. The Airport is a major international airport on par with some of the largest in the world. It was owned and built up by a company owned by José López Vilaboy, the father of plaintiff Jose Ramón López Regueiro, who transformed a minor, outdated airport on the brink of demolition by the Cuban government into what the Airport is now. For his efforts, Vilaboy—like so many other Cubans—was left with nothing when Fidel Castro seized power and set up a communist dictatorship, which stole his property and forced him and his family to flee Cuba.

A large and growing number of Cuban, U.S., and international airlines have used and benefited from the Airport for years—and continue to do so—without ever getting consent from the Vilaboy Family[1] and without paying them a single penny in compensation for trafficking, and benefitting from trafficking, in this stolen property. Plaintiff López Regueiro brings this action for damages from that trafficking.

## THE ACTION

1. Jose Ramón López Regueiro sues defendants American Airlines Inc. ("AA") and Latam Airlines Group, S.A. ("LATAM") under the Cuban Liberty and Democratic Solidarity Act, 22 U.S.C. § 6021, *et seq.* (the "Libertad Act"), for unlawful trafficking in his confiscated property in Cuba.

---

[1] The "Vilaboy Family," prior to March 2, 1989, means José López Vilaboy. After March 2, 1989, the date of Vilaboy's passing, the "Vilaboy Family" means Jose Ramón López Regueiro.

## THE PARTIES

2.      Jose Ramón López Regueiro is a U.S. national as defined by 22 U.S.C. § 623(15), and a natural person who resides in Miami, Florida.

3.      Defendant AA is a Delaware corporation, registered since 1983 with the Florida Department of Corporations to do business in Florida, and with offices in the Southern District of Florida at 901 Ponce de Leon Blvd., Coral Gables, FL 33134.

4.      Defendant LATAM is a Chilean corporation, registered since 2010 with the Florida Department of Corporations to do business in Florida, and with offices in the Southern District of Florida at 6500 NW 22nd Street, Miami, FL 33122.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under the Libertad Act (22 U.S.C. § 6082) and the amount in controversy exceeds $50,000, excluding interest, costs, attorneys' fees, and treble damages.

6.      The Court has general jurisdiction over defendants under Fla. Stat. § 48.193(2) because they are engaged in substantial and not isolated activity within this state by and through their employees, offices and operations in Florida, including their electronic platforms for travel marketing and sales transactions with Floridians, and their operation of passenger and cargo flights between Florida and the Airport, which constitute continuous and systematic contacts with Florida, as more fully set forth below.

7.      This Court has specific personal jurisdiction over defendants under Fla. Stat. §§ 48.193(1)(a)(1), 48.193(1)(a)(2), and 48.193(1)(a)(6): because (a) they operate, conduct and carry on business in Florida; have offices in Florida; regularly avail themselves of the benefits of their presence in Florida; and committed a tortious act within Florida causing injury to plaintiff,

3

who is a Floridian; committed tortious acts outside of Florida while engaging in solicitation within Florida; (b) because this case arises from defendants' business activity in Florida, tortious conduct in Florida, and tortious conduct outside Florida while engaging in solicitation in Florida, which constitute minimum contacts and satisfy due process; and (c) because a substantial part of the events or omissions (including defendants' unlawful trafficking in López Regueiro's property through their operation of passenger and cargo flights to and from the Airport) that give rise to these claims occurred in this judicial District, as more fully described below.

8. Defendants' extensive trafficking activities in Florida extend far beyond running interactive websites aimed at Floridians where they can research, purchase, and pay for flights to and from the Airport—which alone would be enough. At all times material to this action, Defendants also: (a) operated daily cargo and passenger flights between Florida and the Airport; (b) maintained Florida offices and Airport facilities at Miami International Airport ("MIA") with hundreds of employees; (c) maintained Florida registrations and licenses to do business in Florida; (d) sold and profited from passenger and cargo flights between Florida and the Airport; and (e) received substantial revenues from Florida.

9. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2) and 1391(b)(3).

**A.    *Defendant AA***

10. Defendant AA markets itself as "Miami's hometown airline." For example, its July 6, 2021, press release[2] proclaims that "[w]ith more than 30 years of service, American is and will always be Miami's hometown airline, and we are proud to strengthen our footprint at our MIA hub later this year."

---

[2] This press release is available at https://news.aa.com/news/news-details/2021/Miamis-Hometown-Airline-Announces-New-Routes-This-Winter-NET-RTS-07/default.aspx (last visited Sept. 15, 2021).

4



11. AA has more than 13,000 employees in Miami, with an annual payroll exceeding $1.8 billion. AA is the third-largest largest private employer in Miami-Dade County, and claims to contribute more than $21.8 billion annually to South Florida's economy.[3] These employees work both at MIA and at AA's offices in Miami-Dade County, and include employees who service flights between the Airport and Florida, as well as employees who market and sell those flights..

12. AA is the most prominent airline at MIA, accounting for approximately 74% of its total air traffic.[4]

13. Since 2016, MIA has served as the originating location for AA's flights to the Airport, which leads the industry in volume and number of daily departures. AA operates at least five flights per day from MIA to the Airport, and five flights per day from the Airport to MIA.

---

[3] Press release is available at https://news.aa.com/news/news-details/2020/Americans-Miami-Hub-Reaches-Record-Passenger-Numbers-in-2019-OPS-OTH/default.aspx (last visited Sept. 15, 2021).

[4] Statistical information obtained from *American Bulks Up At Miami, Partnering With GOL to Counter Delta-LATAM Alliance*, FORBES (Feb. 4, 2020), https://www.forbes.com/sites/tedreed/2020/02/04/american-bulks-up-at-miami-signing-with-gol-to-counter-deltalatam/?sh=68044d734d97..

No U.S. airline operates more flights to Cuba than AA. Tourists, travelers, and shippers are able to book these flights through AA's main website, www.aa.com.[5]

14. Although AA commenced its own passenger service to the Airport in 2016, since 1991 it also has operated chartered flights to Cuba, including flights to and from the Airport.[6]

15. In 2018, AA became the first U.S. passenger airline to begin cargo service to Cuba and the Airport. Cargo that AA carries to Cuba departs from MIA on AA passenger flights.

16. In announcing the launch of its cargo service to Cuba, AA's vice president of Cargo Operations stated: "As the leading U.S. carrier to Cuba we are excited to launch cargo service to the island. Our teams on the ground in the U.S. and in Cuba have worked hard to make this a reality. This new service will benefit families in both countries." AA also added: "The addition of mail service will further strengthen American's commitment to serving the needs of customers in the U.S.-Cuba market."[7]

17. AA offers passenger and cargo service to Cuba from Miami because Miami is home to a large Cuban and Cuban-American population and because of Miami's geographic proximity to Cuba. AA repeatedly and publicly has expressed its commitment to flying to Cuba from Miami. For example, AA's January 2020 press statement[8] described the company's

---

[5] Although the frequency of AA's flights to Cuba decreased during 2020 due to Covid-19 restrictions, the airline continues to fly from Miami to Cuba and its flights are fully booked until early December 2021. *See* Nora Gámez Torres, *Cuba will reopen its borders in November, hoping its vaccines will keep COVID cases down,* Miami Herald (Sept. 7, 2021), https://www.miamiherald.com/news/nation-world/world/americas/cuba/article254046868.html.
[6] *See American Airlines to launch Cuba cargo service*, AVIPEO.COM, https://www.avipeo.com/en/news/freight/details/american-airlines-to-launch-cuba-cargo-service (May 6, 2018) ("American has served Cuba since 1991 – with charter service for more than 25 years and with scheduled service since September 2016.").
[7] *Id.*
[8] A copy of this press release is available at https://www.bizjournals.com/dallas/news/2020/01/30/american-airlines-cuba.html (last visited Sept. 15, 2021).

application for additional flights, stating that Cuba has been "among the most profitable markets" the airline serves in the Caribbean and that service to Cuba "has now become a really important part of who we are."

### B.     *Defendant LATAM*

18.     Defendant LATAM maintains and operates sizeable facilities and administrative offices in Miami, including a 97,000 square-foot state-of-the-art maintenance hangar at MIA, offices at MIA, and offices at 6500 NW 22nd Street, Miami, FL 33122. Employees at these facilities work in Miami-Dade County, and these employees have serviced passenger and cargo flights between the Airport and Florida and marketed and sold these flights.

19.     At all times material to this action, LATAM operated multiple flights per day to Cuba and, in particular, to the Airport confiscated from López Regueiro. On the date this case was filed, travelers were able to book these flights through LATAM's website, www.latam.com, and through its Airport-dedicated page, http://www.latam.com/en-us/flights-to-havana, which advertised Havana as a tourist destination and suggested trip plans for going there.[9]

20.     LATAM offered and sold Floridians cargo and passenger services to and from the Airport and derived a direct benefit from operating those flights.

## THE LIBERTAD ACT

21.     The Libertad Act was passed on March 12, 1996. One of its express purposes is to deter the exploitation of wrongfully confiscated property in Cuba belonging to United States

---

[9] LATAM attempted to "sanitize" its Cuba operations in response to this lawsuit, shutting down reservations from MIA to the Airport sometime after this case was filed, and blocking internet users in Florida from making reservations to fly to the Airport through a third city, such as Lima, Peru, which LATAM still does. This fact is legally irrelevant, because defendants allowed both in the two years prior to the filing of this action. *See* 22 U.S.C. § 6084. On information and belief, LATAM still carries cargo and passengers from MIA to the Airport through a third city.

nationals by "protect[ing] United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro Regime." 22 U.S.C. § 6022(6).

22. Title III of the Libertad Act provides U.S. nationals whose property in Cuba was confiscated by the communist Cuban regime with a right of action against those who traffic, as defined by 22 U.S.C. § 6023(13), and who benefit from trafficking in that property. *Id.* at §§ 6081-6085.

23. Title III's effective date was August 1, 1996. Defendants' liability for trafficking under Title III has been "established irreversibly" in the years since.[10]

24. Since the Libertad Act's passage in 1996, defendants have been on notice that trafficking in property confiscated by the communist Cuban regime without the consent of, and compensation to, the owner of a claim to the property could render the defendants subject to liability for well-established, common-law claims such as unjust enrichment, tortious interference, and after-the-fact aiding and abetting. The Libertad Act was passed to provide an effective remedy for this infringement of property rights.

25. López Regueiro now sues defendants, who have trafficked in his confiscated property and have benefitted from others' trafficking, under the Libertad Act.

## FACTUAL ALLEGATIONS

**A.    The Property**

---

[10] President's Statement on Action on Title III of the Cuban Liberty and Democratic Solidarity (Libertad) Act of 1995, 32 Weekly Comp. Pres. Doc. 1265 (July 16, 1996) (G.P.O. authenticated version available at www.govinfo.gov/content/pkg/WCPD-1996-07-22/pdf/WCPD-1996-07-22-Pg1265.pdf).
.

26. The Libertad Act expressly defines "property" to include "any property . . . whether real, personal, or mixed, and any present, future, or contingent right, security, or other interest therein . . . ." 22 U.S.C. § 6023(12)(A).

27. In 1932, Pan American Airways ("Pan Am") purchased what was then known as Rancho Boyeros Airport from its original owner, Compañia Nacional Cubana de Aviación Curtiss, S.A. Pan Am operated the airport for nearly two decades, providing both cargo and passenger service. During that time, and with the advent of larger aircraft, the Airport facilities (particularly the runway) became outdated and insufficient. By the early 1950s, given the lack of modernization and mounting pressure to transfer air operations to another location, Pan Am began looking to sell the Airport. It reportedly offered the Airport to the Cuban government, which rejected the offer. Pan Am then made the same offer, on the same terms, to Vilaboy.

28. On July 28, 1955, Vilaboy, through his company Compañia de Aeropuertos Internacionales, S.A. ("CAISA") completed the purchase of the Airport from Pan Am for $1.014.434,99 million pesos. Vilaboy modernized it, extending the runway and building a new, modern terminal building. At that time, the Airport was renamed José Martí Airport.

29. In or around May 1959, the communist Cuban regime confiscated the Airport, stealing the property from Vilaboy, who was its rightful owner. Vilaboy and his family were forced to flee Cuba.

30. The Libertad Act defines the term "confiscated" to include the "nationalization, expropriation, or other seizure by the Cuban government of ownership or control of property, on or after January 1, 1959—(i) without the property having been returned or adequate and effective compensation provided." 22 U.S.C. § 6023(4)(A)(i).

31. The Cuban government maintains possession and control of the Airport and has neither returned it nor paid any compensation to plaintiff for its seizure and use. At all times material to this action, the Airport has been the subject of daily business dealings between defendants and the Cuban government.

32. At all times material to this action, defendants solicited and sold reservations and operated passenger and cargo flights to and from the Airport. Floridians can travel and send cargo to the Airport using defendants' services.

33. Plaintiff López Regueiro owns a majority interest in CAISA and the Airport.

34. When Vilaboy died intestate in Miami Beach, Florida on March 2, 1989, ownership of CAISA and the Airport passed to López Regueiro as a matter of law under Florida Statute § 732.108(2)(c).[11]

35. López Regueiro has also been in physical possession of CAISA's shares since the late 1950s.

36. López Regueiro never abandoned his legitimate interest in and claim to the Airport, and, at the time of filing this lawsuit and since, was and is the rightful owner of the Airport, which is stolen property under the Libertad Act, as to which the Act provides a remedy for defendants' trafficking and benefitting from others' trafficking.

---

[11] López Regueiro's birth certificate and several letters from Vilaboy to López Regueiro's mother, Estela Regueiro Villamide, dating back to 1959, as well as letters from Vilaboy to López Regueiro, acknowledge that López Regueiro is Vilaboy's son. In its November 30, 2010 order, Case No. 10-0494 the Circuit Court for Miami-Dade County Florida Division confirmed that López Regueiro is Vilaboy's sole descendant, approving and adopting the findings of the Report of Guardian ad Litem issued by Lawrence Levy, Esq.

37. The Vilaboy Family was not eligible to file a claim with the Foreign Claims Settlement Commission under Title V of the International Claims Settlement Act of 1949 (22 U.S.C. § 1643, *et seq*.), because they were not U.S. citizens when the Airport was confiscated.

38. López Regueiro did not previously have an opportunity to bring a private right of action because, until May 2, 2019, private rights of action under Title III were suspended pursuant to the authority given to the President of the United States by Congress under the Libertad Act.[12]

### B. *Defendants Have Trafficked and Continue to Traffic in the Airport Without Compensating the Vilaboy Family*

39. In the decades since it was confiscated, the Airport was expanded and modernized to accommodate an ever-increasing volume of flights into and out of the Airport. Ever since the confiscation—and continuing to this day—a number of airlines and other businesses, including the defendants, have used the Airport to transport cargo and passengers.

40. Many of the flights destined for the Airport with cargo, passengers, or both, depart from MIA as detailed above.

41. Defendants transport cargo and passengers in violation of applicable Cuban Asset Control Regulations ("CACRs") promulgated by the Office of Foreign Assets Control ("OFAC").

42. The Libertad Act defines a person who "traffics in confiscated property" as one who

> knowingly and intentionally— . . . (ii) engages in a commercial activity using or otherwise benefiting from confiscated property, or (iii) . . . participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person,

---

[12] Twenty-three (23) years of Presidential suspension of Title III, until May 2, 2019, equitably tolled its March 12, 1996 date for measuring ownership and citizenship until that suspension was lifted on May 2, 2019.

without the authorization of any United States national who holds a claim to the property.

22 U.S.C. § 6023(13)(A).

43. The fact that Vilaboy, through CAISA, owned the Airport prior to its confiscation, and that the Cuban government confiscated the Airport in 1959 is well-known and widely publicized, particularly within the airline industry. Accordingly, and particularly given defendants' long history—spanning several decades—of flight operations in Cuba including to and from the Airport, defendants have known at all material times that Vilaboy, through CAISA, was the Airport's owner and that the Cuban government confiscated the Airport in 1959.

44. In addition, since the Libertad Act's passage in 1996, defendants have been on notice that trafficking in the Airport, which was publicly known to have been confiscated by the Cuban government, would subject them to liability:

> I will allow Title III to come into force. ***As a result, all companies doing business in Cuba are hereby on notice that by trafficking in expropriated American property, they face the prospect of lawsuits and significant liability in the United States***.
>
> \*   \*   \*
>
> Our allies and friends will have a strong incentive to make real progress because, ***with Title III in effect, liability will be established irreversibly during the suspension period and suits could be brought immediately when the suspension is lifted***. And for that very same reason, foreign companies will have a strong incentive to immediately cease trafficking in expropriated property, the only sure way to avoid future lawsuits.

President's Statement on Action on Title III of the Cuban Liberty and Democratic Solidarity (Libertad) Act of 1995, 32 Weekly Comp. Pres. Doc. 1265 (July 16, 1996) (G.P.O. authenticated version available at www.govinfo.gov/content/pkg/WCPD-1996-07-22/pdf/WCPD-1996-07-22-Pg1265.pdf). President Clinton's statement rendered defendants' conduct knowing and intentional under the Act as a matter of law.

45. On July 22, 2019, López Regueiro informed defendants of his intent to commence an action unless they immediately ceased to traffic in the Airport, in compliance with 22 U.S.C. § 6082(a)(3)(D). Defendants have had actual knowledge of plaintiff's claim to the Airport since at least July 22, 2019.

46. Despite being on actual notice, defendants continue to use the Airport for their economic benefit.

47. Neither López Regueiro nor any other U.S. national, if any, who may have had a claim to the property, ever authorized the Cuban government or the defendants to traffic in the Airport.

48. The defendants have never paid—and the Vilaboy Family has never received—any compensation or indemnification whatsoever for defendants' trafficking of the Airport.

49. López Regueiro has been injured by defendants' trafficking in the Airport without his permission, and without paying any compensation to him. The defendants have been unjustly enriched from their trafficking in the Airport.

## CAUSE OF ACTION

### COUNT I
### Private Right of Action Under 22 U.S.C. § 6082(a)(1)
### Against All Defendants

50. López Regueiro incorporates by reference paragraphs 1 to 49 into this count.

51. This claim is brought under Title III of the Libertad Act, 22 U.S.C. § 6082.

52. Defendants are "persons" as defined by 22 U.S.C. § 6023(11).

53. López Regueiro's property was confiscated by the communist Cuban government.

54. When the Airport was confiscated, and ever since, the Vilaboy Family has owned a claim to the Airport.

55. The defendants have knowingly and intentionally used and benefitted, directly and indirectly, from the Airport by soliciting, selling, and operating, for their economic benefit, cargo and passenger services to and from the Airport, which constitutes trafficking in violation of Title III of the Libertad Act.

56. Defendants have conducted this trafficking "without the authorization of any United States national who holds a claim to the property" (22 U.S.C. § 6023(13)) in violation of Title III of the Libertad Act.

57. López Regueiro, in compliance with 22 U.S.C. §§ 6082 (a)(3)(B) and (a)(3)(D), gave notice to the defendants more than 30 days before joining them as defendants in this lawsuit. Notwithstanding this notice, defendants have continued to knowingly and intentionally traffic, and benefit from trafficking, in the Airport.

58. Accordingly, López Regueiro has a right to recover damages to be determined under 22 U.S.C. §§ 6082(a)(1)(A)(i) and 6082(a)(3)(C), together with attorneys' fees and costs under 22 U.S.C. § 6082(a)(1)(A)(ii), and treble damages under U.S.C. § 6082(a)(3).

59. Before this action was filed, On May 2, 2019, the United States Government ceased suspending the right to bring an action under Title III, 22 U.S.C. § 6085, which permits plaintiff López Regueiro to seek the relief requested here.

**PRAYER FOR RELIEF**

For these good and sufficient reasons, López Regueiro demands a judgment against defendants that:

    i. Awards actual damages under 22 U.S.C. § 6082(a)(1)(A)(i);

    ii. Awards attorneys' fees and costs incurred in this action under 22 U.S.C. § 6082(a)(1)(A)(ii);

    iii. Awards treble damages under 22 U.S.C. § 6082(a)(3)(C);

   iv. Awards appropriate post-judgment interest; and

   v. Awards such other relief as the Court deems appropriate.

<b><u>DEMAND FOR JURY TRIAL</u></b>

 López Regueiro demands trial by jury on all issues so triable.

Dated: September 27, 2021

               Respectfully submitted,

               **RIVERO MESTRE LLP**
               2525 Ponce de Leon Blvd., Suite 1000
               Coral Gables, Florida 33134
               Telephone: (305) 445-2500
               Facsimile: (305) 445-2505
               E-mail: arivero@riveromestre.com
               E-mail: jmestre@riveromestre.com
               E-mail: arolnick@riveromestre.com
               E-mail: amalave@riveromestre.com

       By:  /s/ Andrés Rivero
               ANDRÉS RIVERO
               Florida Bar No. 613819
               JORGE A. MESTRE
               Florida Bar No. 88145
               ALAN ROLNICK
               Florida Bar No. 715085
               ANA MALAVE
               Florida Bar No. 83839

               **MANUEL VAZQUEZ, P.A.**
               2332 Galiano St., Second Floor
               Coral Gables, Florida 33134
               Telephone: (305) 445-2344
               Facsimile: (305) 445-4404
               E-mail: mvaz@mvazlaw.com

       By:  /s/ Manuel Vazquez
               MANUEL VAZQUEZ
               Florida Bar No. 132826

## **CERTIFICATE OF SERVICE**

I certify that on September 27, 2021, I electronically filed this document with the Clerk of the Court using CM/ECF. I also certify that this document is being served today on all counsel of record by transmission of Noticed of Electronic Filing generated by CM/ECF.

                                                            _s/ Andrés Rivero_
                                                          ANDRÉS RIVERO